### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND/ODESSA DIVISION

| | |
|---|---|
| **Cedar Lane Technologies Inc.,** | Case No. 7:25-cv-148 |
| Plaintiff, | Patent Case |
| v. | Jury Trial Demanded |
| **Booking Holdings, Inc.,** | |
| Defendant. | |

### COMPLAINT FOR PATENT INFRINGEMENT

1. Plaintiff Cedar Lane Technologies Inc. ("Plaintiff"), through its attorneys, complains of Booking Holdings, Inc. ("Defendant"), and alleges the following:

### PARTIES

2. Plaintiff Cedar Lane Technologies Inc. is a corporation organized and existing under the laws of Canada that maintains its principal place of business at 560 Baker Street, Suite 1, Nelson, BC V1L 4H9.

3. Defendant Booking Holdings, Inc. is a corporation organized and existing under the laws of DE that maintains an established place of business at 327 Congress Ave Ste 300, Austin, TX 78701.

### JURISDICTION

4. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

1

5. This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

6. This Court has personal jurisdiction over Defendant because it has engaged in systematic and continuous business activities in this District. As described below, Defendant has committed acts of patent infringement giving rise to this action within this District.

## VENUE

7. Venue is proper in this District under 28 U.S.C. § 1400(b) because Defendant has an established place of business in this District. In addition, Defendant has committed acts of patent infringement in this District, and Plaintiff has suffered harm in this district.

## PATENT-IN-SUIT

8. Plaintiff is the assignee of all right, title and interest in United States Patent No. 8,397,177 (the "Patent-in-Suit"); including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the Patent-in-Suit. Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action for infringement of the Patent-in-Suit by Defendant.

## THE '177 PATENT

9. The '177 Patent is entitled "Graphic-information flow method and system for visually analyzing patterns and relationships," and issued 2013-03-12. The application leading to the '177 Patent was filed on 2006-01-11. A true and correct copy of the '177 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10. Prior to the invention of the '177 Patent, computer "graphic-making" programs such as CADD (Computer-Aided Design and Drafting) or GIS (Geographic Information System) were used to generate computer graphics. '177 Patent, 1:53-67. However, these programs were

not easily accessible to "non-technicians," such as members of "the public, executives, and experts in non-computer fields," who cannot use them to easily access and manipulate selections of layered materials," "nor can they easily create or assemble their own sets of interactive, layered data." '177 Patent, 2:3-7.

11. GIS did "not provide for seamless access to subset combinations from extensive data sets," and conventional "online GIS interfaces" of the prior art "rel[ied] on the scrolling palette scroll bars to extend the legend and to view selections for queries," which "br[oke] the flow of data selection and severely limit[ed] the organization and amount of data that can be accessed." '177 Patent, 2:24-36. "Annotational information" was "provided by going to a separate Web page or window; and thereby the material [was] not viewed smoothly, in direct association with the map feature." *Id*. at 2:39-42. In prior art GIS interfaces, "a particular subset within a theme cannot be shown or hidden." *Id*. at 2:31-32.

12. "While searchable GIS maps and e-commerce shopping sites [were] growing" in "popular[ity] as image-intensive applications on the Web, the quality of their interactivity and usefulness for visual analysis and comparison [was] extremely low." '177 Patent, 3:36-40. Complex data exploration "was constrained by the slow speed of the Web's [] infrastructure and its standard presentation methods." *Id*. at 3:41-42.

13. "To obtain additional information" using conventional systems and methods, users had to click "hypertext, symbols, drop-down menus, or query forms" to "call up an entirely new Web page," often at a "different Web site with a different format." '177 Patent, 3:50-54. The viewer was forced to "attempt[], with minimal success, to carry in the mind's eye the sequence of information, links, and pages," in order to "build a mental model of the findings of their inquiry, instead of having this accomplished for them in the computer." *Id*. at 3:54-58.

14. To address these technological deficiencies in computer-controlled graphic display systems and methods, the '177 Patent claims unconventional and inventive systems and methods for generating and serving web page content that enabled users to view information in layered and slotted formats optimized for user comprehension via computer-selected image control paradigms. Among other things, the systems and methods of the '177 Patent "combine[d] hypermedia and layering technologies." '177 Patent, 6:45-46.

15. The systems and methods claimed in the '177 Patent represent an architectural advancement in computer interface technology by providing a display with multiple, context-sensitive control panels for manipulating the information presented on the user display in accordance with a selection protocol that implements a data layering process.

16. Rather than simply computerizing pre-existing processes, the '177 Patent claims specific implementations not previously available in the prior art, wherein information is formatted and displayed in response to user control inputs and stored instructions, optimizing the display layout so that information is quickly presented in a form that is readily comprehended despite its complexity.

17. The graphical user interface systems and methods claimed in the '177 Patent improves computer functionality by seamlessly integrating layered and slotted formatted data from local and remote sources to provide a highly versatile information display. This unconventional and inventive approach permits selective control of display and display features so that complex data and data flows can be seamlessly accessed.

18. For example, the systems and methods claimed in the '177 Patent enabled the user to view "the diagram pertinent to the moment," "free of distracting, irrelevant information," which improved the efficiency of the electronic device. '177 Patent, 6:33-34. This enhanced the

speed of a user's navigation of the graphical user interface on the electronic device. In addition, the systems and methods enabled a greater amount of data to be accessed, while diminishing time-consuming scrolling associated with prior art GIS interfaces. '177 Patent, 4:4-4:9.

19. These and other inventive concepts are captured in the unconventional method of Claim 5, including in the limitations requiring "at least one additional layer overlaid over the base map layer wherein each additional layer contains at least one hotel location symbol," as well as in the limitation reciting that "the graphical interface enables a user to show or hide subsets of the hotel location symbols in a particular layer of the map display area." Unlike prior art GIS interfaces, where "a particular subset within a theme **cannot** be shown or hidden," the limitation of Claim 5 requires an inventive graphical user interface in which subsets **can** be shown or hidden. '177 Patent at 2:31-32 (emphasis added). This inventive concept was not only unconventional, but was not previously known in the prior art. Thus, the method of Claim 5 enabled the user to view "the diagram pertinent to the moment," "free of distracting, irrelevant information," which improved the efficiency of the electronic device. '177 Patent, 6:33-34. This enhanced the speed of a user's navigation of the graphical user interface on the electronic device.

20. The technical advancements in the '177 Patent further include a back-end database that continuously or periodically gathers and stores new and changeable information so that the displayed information is always current, and a user-tracking database that tracks user events on the personal computer with the stored data used to return proper map data, to collect and archive data for the user, and to prepare interactive map and diagram analysis reports. This inventive concept is captured in the "performing server-side operations to support interaction with a web browser client by generating and serving web page content to a client computer" limitation of Claim 5.

21. None of the methods of the '177 Patent were previously performed by human beings, or capable of being performed in the human mind.

## COUNT 1: INFRINGEMENT OF THE '177 PATENT

22. Plaintiff incorporates the above paragraphs herein by reference.

23. **Direct Infringement**. Defendant directly infringed one or more claims of the '177 Patent in at least this District by making, using, offering to sell, selling and/or importing, without limitation, at least the Defendant products identified in the charts incorporated into this Count below (among the "Exemplary Defendant Products") that infringed at least the exemplary method claims of the '177 Patent also identified in the charts incorporated into this Count below (the "Exemplary '177 Patent Claims") literally or by the doctrine of equivalents. On information and belief, numerous other devices that infringed the claims of the '177 Patent have been made, used, sold, imported, and offered for sale by Defendant and/or its customers.

24. Defendant also directly infringed, literally or under the doctrine of equivalents, the Exemplary '177 Patent Claims, by having its employees internally test and use these Exemplary Products.

25. **Actual Knowledge of Infringement**. The service of the original complaint asserting the '177 Patent on or about March 8, 2021, in conjunction with the attached claim charts and references cited, constitutes actual knowledge of infringement as alleged here.

26. Exhibit 2 includes charts comparing the Exemplary '177 Patent Claims to the Exemplary Defendant Products. As set forth in these charts, the Exemplary Defendant Products practice the technology claimed by the '177 Patent. Accordingly, the Exemplary Defendant Products incorporated in these charts satisfy all elements of the Exemplary '177 Patent Claims.

27.    Plaintiff therefore incorporates by reference in its allegations herein the claim charts of Exhibit 2.

28.    Plaintiff is entitled to recover damages adequate to compensate for Defendant's infringement.

## JURY DEMAND

29.    Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.    A judgment that the '177 Patent is valid and enforceable

B.    A judgment that Defendant has infringed directly one or more claims of the '177 Patent;

C.    An accounting of all damages not presented at trial;

D.    A judgment that awards Plaintiff all appropriate damages under 35 U.S.C. § 284 for Defendant's past infringement at least with respect to the '177 Patent.

E.    And, if necessary, to adequately compensate Plaintiff for Defendant's infringement, an accounting:

    i.    that this case be declared exceptional within the meaning of 35 U.S.C. § 285 and that Plaintiff be awarded its reasonable attorneys fees against Defendant that it incurs in prosecuting this action;

    ii.    that Plaintiff be awarded costs, and expenses that it incurs in prosecuting this action; and

      iii.    that Plaintiff be awarded such further relief at law or in equity as the Court deems just and proper.

Dated: March 30, 2025                Respectfully submitted,

/s/ Isaac Rabicoff
Isaac Rabicoff
Rabicoff Law LLC
4311 N Ravenswood Ave Suite 315
Chicago, IL 60613
7736694590
isaac@rabilaw.com

**Counsel for Plaintiff**
**Cedar Lane Technologies Inc.**